**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

---

DYLAN OBRECHT, SHELBY
STINSON, MACKENZIE STAFFORD
and GRACE GILBERT, individually
and on behalf of all others similarly
situated,                                              JURY TRIAL DEMANDED

        *Plaintiffs*,

    v.

CENTRAL GARDEN & PET                      Case No.
COMPANY,

        *Defendant.*

---

## CLASS ACTION COMPLAINT

Plaintiffs, Dylan Obrecht, Shelby Stinson, Mackenzie Stafford, and Grace Gilbert, ("hereinafter Plaintiffs"), individually, and on behalf of all other similarly situated persons, by and through their undersigned counsel, bring this Class Action Complaint against Defendant, Central Garden & Pet Company, (hereinafter "Defendant").

### SUMMARY OF THE CASE

1.    Central Garden & Pet Company, is a company that manufactures, markets and labels pet food products named AvoDerm Natural.  Defendant's marketing and labeling practices of AvoDerm Natural claims to offer "natural" pet food products which are made from natural ingredients, thus void of synthetic and/or artificial ingredients.

2.    Defendant manufactures a line of pet food products (hereinafter referred to as "AvoDerm Natural") sold with a label that, in describing the contents, displays the word "natural."  In truth, AvoDerm Natural contains synthetic and/or artificial chemical compounds

1

including but not limited to tocopherols, ascorbic acid, lecithin, ferrous sulfate, manganese sulfate, and copper sulfate.

3.      Defendant knowingly and purposefully failed to disclose to its consumers that AvoDerm Natural contains synthetic and/or artificial chemical compounds, making these products falsely labeled and not actually "natural." The AvoDerm Natural products include, but are not limited to, the following:

- AvoDerm Natural Grain Free Salmon Meal & Potato Formula for Dogs;

- AvoDerm Natural Grain Free Red Meat Meal & Potato Formula for Dogs;

- AvoDerm Natural Grain Free Ocean Fish & Chicken Meal Formula for Cats;

- AvoDerm Natural Grain Free Turkey Meal Formula for Cats.

4.      Defendant knowingly and purposefully failed to disclose to its consumers that the AvoDerm Natural products are not actually "natural."  To this day, Defendant has taken no meaningful steps to clear up consumers' misconceptions regarding its product.

5.      As a consequence of Defendant's unfair and deceptive practices, Plaintiffs, and members of the Class, purchased AvoDerm Natural products under the false impression that, by purchasing Defendant's goods they would be receiving products that were in fact "natural," or completely void of synthetic and/or artificial ingredients. Through their deceptive practices, Defendant sold its "natural" products to thousands of consumers and received a substantial financial profit.

6.      Significantly, **each** consumer has been exposed to the **same** material misrepresentations and/or omissions, which are prominently displayed on the product packaging for AvoDerm Natural products, and on Defendant's website, prior to purchasing the products.

2

7.      Despite the fact that AvoDerm Natural products contain synthetic and/or artificial chemical ingredients, the front labels of Defendant's AvoDerm Natural products display the word "Natural."

8.      Under Federal law, products such as Defendant's AvoDerm Natural products are "misbranded" if their "labeling is false or misleading in any particular," or if they do not contain certain information on their labeling. *See* 21 U.S.C. § 343(a).

9.      Further, any violation of 21 U.S.C. § 343(a) also constitutes violations of Florida's Consumer Protection Statues §§501.201-501.213 (2014), Florida Deceptive and Unfair Trade Practice Act, False Advertising pursuant to Fla. Stat. § 817.44 (2014), Breach of Express Warranty; Breach of Implied Warranties for Merchantability and Usage of Trade Pursuant to Fla. Stat. §672.314 (2014), Breach of Implied Warranty pursuant to Uniform Commercial Code §2-314 (2014), Negligence and Unjust Enrichment. In this action, Plaintiffs assert claims under these state statutes, as well as under common law.

10.     For the reasons stated herein, Defendant's AvoDerm Natural products sold in the United States are misbranded and illegal.

11.     Plaintiffs now seek to stop Defendant's unlawful conduct.

## PARTIES

12.     Plaintiffs, Dylan Obrecht, Shelby Stinson, Mackenzie Stafford, and Grace Gilbert, purchased Defendant's AvoDerm Natural products in this State and this District within the four years preceding the filing of this action (the "Class Period").

13.     In or about January 2015, Plaintiff, Dylan Obrecht, purchased AvoDerm Natural Grain Free Salmon Meal & Potato Dry Dog Food 24 pound bag for $55.99 at a Petco pet store in this State and this District within the four years preceding the filing of this action.

14.     In or about November 2014, Plaintiff, Shelby Stinson, purchased AvoDerm Natural Grain Free Red Meat Meal & Potato Dry Dog Food 24 pound bag for a premium $52.99 at a Petco pet store in this State and this District within the four years preceding the filing of this action.

15.     In or about October 2014, Plaintiff, Mackenzie Stafford, purchased AvoDerm Natural Grain Free Ocean Fish & Chicken Meal Formula Adult Cat Food 24 pound bag for a premium $32.99 at a Petco pet store in this State and this District within the four years preceding the filing of this action.

16.     In or about December 2014, Plaintiff, Grace Gilbert, purchased AvoDerm Natural Grain Free Turkey Meal Formula Adult Cat Food 24 pound bag for a premium $32.99 at a Petco pet store in this State and this District within the four years preceding the filing of this action.

17.     Plaintiffs are and, throughout the entire class period asserted herein, have been very concerned about, and try to avoid, purchasing foods for their pets that are not natural—such as foods that contain synthetic and/or artificial chemical ingredients. For this reason, Plaintiffs were willing to pay a premium price for pet foods that were "natural."  Based on the "natural" representation on Defendant's AvoDerm Natural products' labels, Plaintiffs and members of the Class reasonably believed the products they purchased were "Natural" and relied on this representation in making the purchases thereof.

18.     Not only did Plaintiffs purchase the AvoDerm Natural products because the labels said they were "natural," Plaintiffs also paid more money for the products than they would have paid for other similar products that contained synthetic and/or artificial ingredients.

19.    Had Plaintiffs known the truth—that the AvoDerm Natural products were not "natural"— they would not have purchased these products, and would not have paid the premium price for these products.

20.    Defendant, Central Garden & Pet Company, is a corporation incorporated in the State of Delaware, with its principal place of business located at 1340 Treat Boulevard, Suite 600, Walnut Creek, California 94597.

21.    Defendant is a corporation that produces, advertises, markets, sells and distributes the AvoDerm Natural products throughout the United States, including in this State, District, and Division.

## JURISDICTION AND VENUE

22.    This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which: (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (2) a member of the class of Plaintiffs are citizens of a State different from the Defendant; and (3) the number of members of all proposed Plaintiff classes in the aggregate is greater than 100.

23.    This Court has personal jurisdiction over Defendant because a substantial portion of the wrongdoings alleged herein occurred in Florida. Defendant also has sufficient minimum contacts with Florida, and has otherwise intentionally availed itself to the markets in Florida through the promotion, marketing, and sale of products sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

24.    Venue is proper in this District pursuant to 28 U.S.C. § 139(b)(2) and (3) because a substantial part of the events or omissions giving rise to these claims occurred in this District, a substantial part of the events or omissions giving rise to the claim occurred within this District,

Defendant caused harm to Plaintiffs in this District, and Defendants are subject to the Court's personal jurisdiction with respect to this action.

## FACTS RELEVANT TO ALL CLAIMS

*Definition of "Natural"*

25.    Representing that a food product or ingredient is "natural" is a statement of fact, and this term has been defined by the federal governmental agencies that regulate food companies such as the Defendant.

26.    Although the Food and Drug Administration (FDA) does not directly regulate the term "natural," the FDA has established a policy defining the outer boundaries of the use of that term by clarifying that a product is not natural if it contains color, artificial ingredients or flavors, or synthetic substances. Specifically, the FDA states: "the agency will maintain its policy regarding the use of 'natural,' as meaning nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food." 58 Fed. Reg. 2302, 2407 (Jan. 6, 2003).

27.    Pursuant to 7 C.F.R. § 205.2, an ingredient is synthetic and/or artificial if it is:

> *Synthetic*. A substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources, except that such term shall not apply to substances created by naturally occurring biological processes.

> *Nonsynthetic (natural)*. A substance that is derived from mineral, plant, or animal matter and does not undergo a synthetic process as defined in section 6502(21) of the Act (7 U.S.C. 6502(21)). For the purposes of this part, nonsynthetic is used as a synonym for natural as the term is used in the Act.

28.    Similarly, the USDA's Food Safety and Inspection Service ("FSIS") defined a natural product as, "a product that does not contain any artificial or synthetic and/or artificial ingredients and does not contain any ingredient that is more than "minimally processed":

> Minimal processing may include: (a) those traditional processes used to make food edible or to preserve it or to make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting, or (b) those physical processes which do not fundamentally alter the raw product and/or which only separate a whole, intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices. Relatively severe processes, e.g., solvent extraction, acid hydrolysis, and chemical bleaching would clearly be considered more than minimal processing…

*See* USDA FSIS, Food Standards and Labeling Policy Book, available at

www.fsis.usda.gov/OPPDE/larc/Policies/Labeling_Policy_Book_082005.pdf.

29.    In addition, in an FDA letter to Judges Yvonne Gonzalez Rogers, Jeffrey S. White, and Kevin McNulty, regarding the judges' request for the agency to make a determination about whether and under what circumstances food products containing ingredients produced using certain synthetic and/or artificial ingredients may be labeled "natural," the FDA writes:

> FDA has not promulgated a formal definition of the term "natural" with respect to foods. The agency has, however, stated that its policy regarding the use of the term "natural" on food labeling means that "nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to bin tin the food."

*See* 58 Fed. Reg. 2302, 2407 (1993).

30.    A reasonable consumer's understanding of the term "natural" comports with these federal definitions.

31.    A reasonable consumer would also expect that Defendant's products are what Defendant identifies them to be on its labels (i.e. that they are "natural" and thus void of synthetic and/or artificial ingredients).

***The Products' Synthetic and/or artificial Ingredients***

32.    **Tocopherols are not "natural" preservatives.** Tocopherols are a family of Vitamin E compounds which, typically, are found in leafy green vegetables, vegetable oils, fish and nuts. Tocopherols are commercially manufactured and mass produced in an attempt to utilize

them as preservatives that extend the shelf life of products. Since there is usually a long span of time between the product's production and the time of purchase, commercial foodstuffs are typically loaded with preservatives, such as tocopherols, to allow them to remain as fresh as possible for as long as possible. Although said preservatives are fairly effective in extending the longevity of the products, they are still extremely unhealthy. Many cause and/or promote skin problems while others have been reported to cause cancer. According to an article on the use of preservatives to extend the shelf life of products, there is no such thing as a natural preservative, "natural substances that show antimicrobial activity are either not adequate for broad spectrum protection or they have undesirable qualities."[1] Furthermore, taking synthetic and/or artificial vitamin E (tocopherols) can increase the risk of prostate cancer by 17%. Additionally, in a Fact Sheet on Vitamin E, the U.S Department of Health & Human Services writes that, "HOPE-TOO [a follow up to clinical trial HOPE] found that Vitamin E provided no significant protection against heart attacks, strokes, unstable angina, or death from cardiovascular disease or other causes after 7 years of treatment." The fact sheet then goes on to specify that, "Participants taking Vitamin E, however, were 13% more likely to experience, and 21% more likely to be hospitalized for, heart failure, a statistically significant…finding." The participants in the clinical trials were given **natural** Vitamin E and still, "experienced no fewer cardiovascular events or hospitalizations for heart failure or chest pain than participants taking a placebo." Therefore, no argument can be made for the benefits of synthetic Vitamin E – such as those in question in this complaint – since, according to the same article, synthetically produced tocopherols are only half as effective as the same amount of the natural form, and the natural forms are proven ineffective.[2]

---

[1] https://www.fromnaturewithlove.com/library/preservatives.asp
[2] http://ods.od.nih.gov/factsheets/VitaminE-HealthProfessional/

33.    **Ascorbic Acid.**  Ascorbic acid is the synthetic and/or artificial version of vitamin C and, as such, does not differentiate between good and bad bacteria in the intestines, once consumed. Consequently, the chemical kills good bacteria essential for healthy development and digestion. Synthetic and/or artificial vitamin C, or ascorbic acid, is not found in nature – it cannot be taken from plants or trees, for instance – it can only be made in a lab.  Consequently ascorbic acid and vitamin C are not truly the same thing. As a matter of fact, ascorbic acid does not contain the full complex of elements that define vitamin C. This absence is precisely what makes ascorbic acid so destructive—the full range of elements present in vitamin C must be present in its synthetic and/or artificial counterpart in order for the body to absorb and benefit from the complex. According to an article published by Diamond Back Drugs on the veterinary uses of ascorbic acid, "excessive use of [ascorbic acid] can cause the formation of calculi in the kidneys. Intestinal irritation and diarrhea can also occur with large doses and in very rare cases, anemia can develop." Furthermore, the article states, "some animals have been found to be sensitive to ascorbic acid."[3] Furthermore, according to an article published in PetPlace.com regarding the use of ascorbic acid for dogs and cats, "in dogs and cats, ascorbic acid is manufactured in the liver and normally does not need to be supplemented. Claims that nutritional deficiency of ascorbic acid causes scurvy in dogs and cats are probably inaccurate." The article goes on to state that, "ascorbic acid…should not be administered except under the supervision and guidance of a veterinarian."[4] Additionally, in a fact sheet on ascorbic acid by the U.S Department of Health & Human Services, the most common side effects of excessive use are, "diarrhea, nausea, abdominal cramps, and other gastrointestinal disturbances." Furthermore, the fact sheet notes that, "a few studies in vitro have suggested that by acting as a pro-oxidant, supplemental oral

---

[3] http://www.diamondbackdrugs.com/ascorbic-acid-in-veterinary-use/
[4] http://www.petplace.com/drug-library/ascorbic-acid-vitamin-c/page1.aspx

vitamin C could cause chromosomal and/or DNA damage and possibly contribute to the development of cancer."[5]

34.    **Lecithin.** Though lecithin is naturally found in some foods, food manufacturers utilize commercial lecithin, which is not naturally occurring and is a mixture of phospholipids in oil. In a petition to the USDA to remove lecithin from the National List of Synthetics Allowed in Organics, Dr. Bernard Szuhaj, an expert on lecithin, states, "commercial lecithin is made from crude soybean oil extracted from soybean flakes with **hexane**. The crude soybean oil is treated with water or stream to precipitate the lecithin as gums. These wet gums are centrifuged and dried. Soybean oil and fatty acids are added to standardize the products." Dr. Szuhaj then goes on to say that, "the hexane used in commercial soybean processing is a neurotoxicant. In powdered and granular lecithin, acetone is used to precipitate the phospholipids from the oil and the acetone is removed by filtration and evaporation. Oxidized acetone may result in the acetone recovery process producing toxic compounds such as mesityl oxide and isopherone." In the same document found on the USDA website, a USDA/Tap Reviewer Comment Form states that, "chemically modified lecithins are synthetic substances and should not be allowed under this classifications [National List]." Furthermore, the USDA Reviewer Form states that, "there is certainly a chance that trace amounts of **hexane** can be found in lecithin. Optimally lecithin from cold pressed oils would be a preference in the organic industry. However, the quality of these lecithins has been very poor." About ingesting **hexane**, which can be found in lecithin, the document states that, "[hexane] may produce abdominal pain, nausea. Aspiration into lungs can produce severe lung damage and is a medical emergency."[6] Furthermore, lecithin must be modified in order to make it suitable for the product to which it is added. Consequently,

---

[5] http://ods.od.nih.gov/factsheets/VitaminC-HealthProfessional/
[6] http://www.ams.usda.gov/AMSv1.0/getfile?dDocName=STELPRDC5073281

manufacturers typically hydrolyze lecithin enzymatically. According to the FDA, "Food grade lecithin is a complex mixture of substances derived from the **processing** of soybean, corn, or safflower oil."[7] Furthermore, lecithin may be modified by a process called fractionation during which lecithin is mixed with alcohol. Thus, lecithin is highly processed. According to an article on the side effects of lecithin use in dogs and cats published in a veterinary website, some side effects of lecithin use may include, "vomiting, diarrhea, bloating, lack of appetite, gas, [and] skin rashes."[8]

35. **Ferrous Sulfate.** Ferrous Sulfate is a type of iron added to dog food to boost iron content. Besides being commercially produced through chemical means such as the oxidation of pyrite, iron is the most abundant trace mineral in a dog's body and, consequently, not a necessary supplement. Furthermore, consuming too much iron may be toxic. According to the ASPCA, iron toxicity is a very common problem among animals. In a toxicology brief by Jay Alberetson, DVM, PhD, DABT, DABVT, of the ASPCA, "one reason iron toxicosis is such an important problem is that the general public is often unaware of the potential toxicity of products that are considered natural." Furthermore, since iron is already present – in high amounts – in dogs' bodies, more of it from outside sources may lead to increase chances of iron poisoning since, "toxicity depends on the amount of iron already in the body." The brief goes on to note that, "some animals develop clinical signs of toxicosis even when they receive doses that cause no problems in other animals."[9] Common side effects of an excess of iron in animals are vomiting, diarrhea, depression, gastrointestinal hemorrhage and abdominal pain, among others. According to the U.S Department of Health & Human Services, "acute intakes of…iron…can lead to gastric

---

[7] http://www.accessdata.fda.gov/scripts/fcn/fcnDetailNavigation.cfm?rpt=scogsListing&id=185
[8] http://www.vetinfo.com/lecithin-for-dogs.html#b
[9] http://www.aspcapro.org/sites/pro/files/zn-vetm0206_082-090.pdf

upset, constipation, nausea, abdominal pain, vomiting, and faintness." Furthermore, they note, "between 1983 and 2000, at least 43 U.S. children died from ingesting supplements containing high doses of iron…Accidental ingestion of iron supplements cause about a third of poising deaths among children reported in the United States between 1983 and 1991."[10]

36.    **Manganese Sulfate.** Manganese sulfate is a commercially significant manganese salt. It is estimated that 260 thousand tons of this chemical compound were produced worldwide in 2005 alone. Manganese sulfate is produced in laboratories by treating manganese dioxide with sulfur dioxide. In addition, manganese sulfate is a by-product of various industrially significant oxidations that use manganese dioxide. Furthermore, it has been established that manganese sulfate is harmful if inhaled and sometimes harmful is swallowed. Exposure may cause eye, skin, and respiratory tract irritation and may even lead to lung damage, and central nervous system effects. Additionally, ingestion may cause gastrointestinal irritation with nausea, vomiting and diarrhea.[11] Furthermore, according to the EPA, "chronic (long-term) exposure to high levels of manganese by inhalation in humans may result in central nervous system (CNS) effects. Visual reaction time, hand steadiness, and eye-hand coordination were affected in chronically-exposed workers." The EPA also states that, "A syndrome named manganism may result from chronic exposure to higher levels; manganism is characterized by feelings of weakness and lethargy, tremors, a mask-like face, and psychological disturbances." It is also noted that, "effects to the lung have been reported following acute [short-term] exposure of rats to manganese via inhalation." Regarding reproductive and developmental effects of manganese in animals, the EPA notes, "animal studies have reported degenerative changes in the seminiferous tubules leading to sterility from intratracheal instillation of high doses of manganese…In young animals

---

[10] http://ods.od.nih.gov/factsheets/Iron-HealthProfessional/
[11] http://www.labchem.com/tools/msds/msds/75541.pdf

exposed to manganese orally, decreased testosterone production and retarded growth of the testes were reported." Furthermore, though the EPA states that oral human and animal studies on manganese may be inadequate, it goes on to say that, "several animal studies reported an increased incidence of thyroid gland follicular cell adenomas and hyperplasia, or increased incidence of pancreatic tumors."[12]

37.    **Copper Sulfate.** Copper sulfate is an inorganic compound that combines sulfur with copper. The toxicity of copper sulfate depends on the copper content. Copper sulfate has been registered for use in pesticide products in the United States since 1956. Furthermore, it is produced industrially by treating copper metal with hot concentrated sulfuric acid. According to an article on the toxicity of copper sulfate by Cornell University, "symptoms are severe…if copper sulfate is retained in the stomach." The article goes on to state that some side effects include burning pain in the chest and abdomen, intense nausea, vomiting, diarrhea, headache, sweating, shock, discontinued urination, injury to the brain, liver, kidneys, stomach and intestinal linings. Furthermore, the article notes that, "copper sulfate can be corrosive to the skin and eyes. It is readily absorbed through the skin and can produce a burning pain, along with the same severe symptoms of poising from ingestion."[13] Further, the FDA defines Copper Sulfate as usually being used in "the pentahydrate form. This form occurs as large, deep blue or ultramarine, triclinic crystal; as blue granules, or as a light blue powder. The ingredient is prepared by the **reaction** of **sulfuric acid** with **cupric oxide** or with **copper metal**."[14] Additionally, in a Compound Summary of copper sulfate with the U.S. National Library of Medicine, the compound is manufactured by a, "reaction of scrap or shot copper with dilute

---

[12] http://www.epa.gov/airtoxics/hlthef/manganes.html
[13] http://pmep.cce.cornell.edu/profiles/extoxnet/carbaryl-dicrotophos/copper-sulfate-ext.html
[14] http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/CFRSearch.cfm?fr=184.1261

sulfuric acid and air." Furthermore, it is a, "byproduct of copper electrolysis and etching process product is generally only suitable for agricultural purposes." Copper sulfate may also cause pain and redness of the skin, coughs, sore throat, blurred vision, abdominal pain, burning sensation, nausea, vomiting, and diarrhea, among other things. The summary goes on to state that, "the substance is severely irritating to the eye and skin… [is] corrosive on ingestion. Ingestion could cause effects on the blood, kidneys and liver."[15]

38.     While Defendant labels its AvoDerm Natural products at issue in this matter as "natural," tocopherols, ascorbic acid, lecithin, ferrous sulfate, manganese sulfate, and copper sulfate, ingredients in Defendant's product, are synthetic and/or artificial compounds.  Further, there are warnings that the excessive use of the aforementioned ingredients can lead to: anal irritation, burning sensation, diarrhea, gas, nausea, and stomach cramps, among other side effects, in animals.

39.     While Defendant's "natural" food labels did disclose that they contain these ingredients, those labels did not disclose that these ingredients are synthetic and/or artificial. This is a significant and material omission given Defendant's "natural" representation on the food product labels. Based on said representation, one would normally expect that none of the ingredients in Defendant's food products would be synthetic and/or artificial or artificial.

40.     According to the product labels, Defendant's food products contain the recognized synthetic and/or artificial ingredients identified herein, as follows:

- AvoDerm Natural Salmon Meal & Potato Formuals for Dogs: tocopherols, ascorbic acid, lecithin, ferrous sulfate, manganese sulfate, and copper sulfate.

- AvoDerm Natural Grain Free Red Meat Meal & Potato Formula for Dogs: tocopherols, ascorbic acid, lecithin, ferrous sulfate, manganese sulfate, and copper sulfate.

---

[15] http://pubchem.ncbi.nlm.nih.gov/compound/Copper_sulfate#section=Toxicity

- **AvoDerm Natural Grain Free Ocean Fish & Chicken Meal Formula for Cats:** tocopherols, ascorbic acid, lecithin, ferrous sulfate, manganese sulfate, and copper sulfate.

- **AvoDerm Natural Grain Free Turkey Meal Formula for Cats:** tocopherols, ascorbic acid, lecithin, ferrous sulfate, manganese sulfate, and copper sulfate.

*See* 7 C.F.R. 205.105; 7 C.F.R. 205.601; 7 C.F.R. 205.603; 7 C.F.R. 205.605

41.     The labeling of products as "natural," carries implicit health benefits that are highly important to consumers, when it comes to their pet's diet—benefits for which consumers are willing to pay a premium price over comparable products that are not natural. Over the past several years, Defendant has cultivated and reinforced a corporate image that has catered to this "natural" theme and has boldly placed this claim on each and every one of its products, despite the fact that Defendant uses synthetic and/or artificial ingredients in the products identified above.

42.     Defendant has used the term "natural" to shape its brand and sell its pet foods. Yet, the existence of synthetic and/or artificial ingredients in its pet food renders the use of the label "natural" false and misleading. In manufacturing it products, Defendant had a choice between using natural or synthetic and/or artificial ingredients. It purposefully chose to use synthetic and/or artificial ingredients, but nonetheless labeled its food products as "natural."

***AvoDerm Natural's Products are Misbranded and Illegal***

43.     All containers of AvoDerm Natural products sold in the United States are misbranded, falsely labeled, and as such are illegal.

44.     Their sale constitutes violations of the FDCA, Florida's Consumer Protection Statues §§501.201-501.213 (2014), Florida Deceptive and Unfair Trade Practice Act, False Advertising pursuant to Fla. Stat. § 817.44 (2014), Breach of Express Warranty pursuant to Fla.

Stat. §672.313 (2014),; Breach of Implied Warranties for Merchantability and Usage of Trade pursuant to Fla. Stat. §672.314 (2014), Negligence and Unjust Enrichment.

45.    With the nutritional and health benefits of "natural" foods becoming widely known, consumer demand for these products has increased rapidly, expanding to all aspects of life, including what consumers choose to feed their pets. It was this enormous new market that Defendant hoped to tap with the sale of its AvoDerm Natural products.

46.    Defendant knowingly and intentionally sold these misbranded and falsely labeled products to consumers (including Plaintiffs) with the intent to deceive them.

47.    Plaintiffs purchased AvoDerm Natural products within the Class Period.

48.    Despite the prevalence of synthetic and/or artificial ingredients in the Subject Products, the front labels of the AvoDerm Natural products display the words "Natural."

49.    AvoDerm Natural products mislead consumers into believing the products consist of only "Natural" ingredients, when they in fact contain the synthetic and/or artificial chemical ingredients tocopherols, ascorbic acid, lecithin, ferrous sulfate, manganese sulfate, and copper sulfate.

50.    Had Plaintiffs known that AvoDerm Natural products were not "natural," Plaintiffs would not have purchased these AvoDerm Natural products.

51.     Had Plaintiffs known that AvoDerm Natural products were illegally sold products, Plaintiffs would not have purchased AvoDerm Natural products.

52.    Plaintiffs' reliance was reasonable.  A reasonable consumer would have been misled by Defendant's actions.

53.     With respect to AvoDerm Natural products, Defendant has violated the FDCA and regulations promulgated thereunder.  Specifically 21 U.S.C. 321(f) provides "the term 'food' means (1) articles used for food or drink for man or other animals."

54.     Defendant has violated 21 U.S.C. 331(a).  Specifically, 21 U.S.C. 331(a) provides that it is unlawful to introduce or deliver for introduction into interstate commerce any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded.

55.     Defendant has violated 21 U.S.C. 331(b).  Specifically, 21 U.S.C. 331(b) provides that the act of adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce is prohibited.

56.     Defendant has violated 21 U.S.C. 331(c).  Specifically, 21 U.S.C. prohibits the receipt in interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay.

57.     Defendant has violated 21 U.S.C. 331(g).  Specifically, 21 U.S.C. 331(g) provides that it is unlawful to manufacture within any territory any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded.

58.     The FDCA generally prohibits misleading labeling. *See* 21 U.S.C. § 343(a) ("A food shall be deemed to be misbranded" if "its labeling is false or misleading in any particular."). Furthermore, although the FDA has not issued a regulation defining the word natural, it has articulated a "policy," defining natural to mean, "that nothing artificial or synthetic and/or artificial…has been included in, or has been added to, a food that would not normally be expected to be in the food." *See* 58 Fed. Reg. 2302, 2407 (Jan. 6, 1993); *see also* FDA Warning Letter to Alexia Foods, Inc. (Nov.16, 2011), http://www.fda.gov/ICECI.Enforcementactions/WarningLetters/ecm281118.htm (describing

SAPP as "a synthetic and/or artificial chemical preservative," and stating that the term "All Natural" on a food product containing SAPP "is false and misleading"). The conduct Plaintiffs allege – that Defendant misled customers by labeling as "natural" dog food products that contain tocopherols, ascorbic acid, lecithin, ferrous sulfate, manganese sulfate, and copper sulfate– thus violates the FDCA. Plaintiffs have not, however, sued because the conduct violates the FDCA. Rather, their claims are based on Florida statues as well as the common law, law that could exist, "even if the FDCA were never passed." *Werdebaugh v. Blue Diamond Growers,* No. 12-cv-02724-LHK, 2013 WL 5487236, at *7 (N.D. Cal. Oct. 2, 2013).

59.     It is plausible that a reasonable consumer, such as Plaintiffs and members of the Class, could interpret the words "natural" to exclude synthetic and/or artificial compounds such as tocopherols, ascorbic acid, lecithin, ferrous sulfate, manganese sulfate, and copper sulfate, and therefore be misled by Defendant's labeling. *See, e.g., Vicuna v. Alexia Foods, Inc.,* No. 11-6119 (PJH), 2012 WL 1497507, at *2 (N.D. Cal. Apr. 27, 2012) (holding that "whether a reasonable consumer" of a product that  contains SAPP "would likely be deceived by the designation 'All Natural' is a factual dispute" that cannot be resolved at the motion to dismiss stage); *see also Janney v. Mills,* No. 12-cv-03919 (WHO), 2014 WL 1266299, at *3 (N.D. Cal. Mar. 26, 3014) (collecting cases in which "[c]ourts have found similar claims challenging the terms 'all natural' and 'natural' to be sufficient basis for a cause of action under California's consumer protection laws"); *Morales v. Unilever U.S., Inc.,* No. 13-cv-2213 (WBS), 2014 WL 1389613, at *7 (E.D. Cal. Apr. 9, 2014) (explaining that "the relevant question" in a deceptive labeling case "is the meaning that consumers would attach to the term" at issue and that "this is generally not a question that can be resolved on a motion to dismiss"); *Von Koenig v. Snapple Beverage Corp.,* 713 F. Supp 2d 1066, 1080 (E.D. Cal. 2010) ("[P]laintiffs allege that they were deceived by the labeling of

defendant's drink products as 'All Natural' because they did not believe that the product would contain [high fructose corn syrup]…[P]laintiffs have stated a plausible claim that a reasonable consumer would be deceived by defendant's labeling.")

***Defendant's Strategy to Appeal to Health-Conscious Consumers***

60.     Defendant engaged in this fraudulent advertising and marketing scheme because it knew that its target market pays more for "natural" dog food products than for conventional dog food products. This is due to the association consumers make between "natural" dog food products and a wholesome way of life for pets, the perceived higher quality, health and safety benefits of the products, and/or low impact on the environment.

61.     As such, Defendant's "natural" labeling is central to its marketing of the products and part of its overall strategy to capture the rapidly expanding natural foods market. As a result, Defendant commands a premium price for the products; using "natural" claims to distinguish them from its competitors' food products.

62.     As Defendant is reasonably aware, many American consumers are health-conscious and seek out wholesome natural foods to ensure their pets keep a healthy diet. Because of this, consumers routinely take nutrition information into consideration in selecting and purchasing dog food items.

63.     Consumers also value "natural" ingredients for countless other reasons, including perceived benefits of avoiding disease, helping the environment, assisting local farmers, assisting factory workers who would otherwise be exposed to synthetic and/or artificial and hazardous substances, and financially supporting the companies that share these values.

64.     Product package labels, including nutrition labels, are vehicles that convey nutrition information to consumers, which they can and do use to make purchasing decisions. As

noted by food and Drug Administration Commissioner Margaret Hamburg during an October 2009 media briefing, "[s]tudies show that consumers trust and believe the nutrition facts information and that many consumers use it to help them build a healthy diet."

65.    The prevalence of claims about nutritional content on food packaging in the United States has increased in recent years as manufacturers have sought to provide consumers with nutrition information and thereby influence their purchasing decisions.  The results of a recent FDA Food Labeling and Package Survey found that approximately 4.8 percent of food products sold in the United States had either a health claim or qualified health claim on the food package, and that more than half (53.2%) of the food products reviewed had nutrient content claims on the packaging.

66.    Consumers attribute a wide range of benefits to foods made entirely of natural ingredients.  Consumers perceive "natural" foods to be higher quality, healthier, safer to eat, and less damaging to the environment.

67.    Catering to consumers' taste for natural foods is tremendously advantageous for business.  In 2008, foods labeled with the word "natural" produced $22.3 billion in sales, a 10% increase from 2007, and a 37% increase from 2004.  In 2009, sales jumped again by 4%.

68.    It was in an effort to capture the growing demand and to entice consumers to purchase its products that Defendant committed the unlawful acts detailed in this Complaint.

69.    Consumers lack the ability to test or independently ascertain the accuracy of a food product label, especially at the point of sale. Reasonable consumers must and do rely on the company to honestly report the nature of a food product's ingredients.

70.     Moreover, not having the specialized food chemistry and regulatory knowledge necessary to make independent determinations thereof, a reasonable consumer would interpret the fine-print ingredient label in a way to be consistent with the front label representation.

71.     Food product companies intend for consumers to rely upon their products' labels, and reasonable consumers do, in fact, so rely.  Those labels are the only available source of information consumers can use to make decisions on whether to buy "Natural" food products.

72.     As a result of its false and misleading labeling, Defendant was able to sell its Products to thousands, if not hundreds of thousands of consumers, throughout the United States, and to profit handsomely from these transactions.

***Defendant's Knowledge of the Falsity of its Advertising***

73.     Defendant had knowledge of the representations that were made regarding the AvoDerm Natural products, insofar as all of those representations appeared on the AvoDerm Natural products' packages.

74.     Defendant also knew what ingredients were added to each product, as (presumably) all product ingredients are listed on the product packages and all of the AvoDerm Natural products' ingredients are further disseminated on Defendant's website.

75.     Defendant is governed by and has knowledge of the federal regulations that control the labeling of its food products and, thus, was aware that some of the ingredients have been federally declared as synthetic and/or artificial substances and/or require extensive processing to be safely used as a food ingredients.  Defendant has retained expert nutritionists, food chemists, and other scientists, and has spent much time and money in developing its own food technologies, such that it was aware that the synthetic and/or artificial substances used in its products are not natural.

76.    As such, Defendant had knowledge of all facts demonstrating that its "natural" AvoDerm Natural products contain synthetic and/or artificial substances and that the products were falsely labeled.

77.    The misrepresentations and omissions were uniform and were communicated to Plaintiffs, and to each member of each class, at the point of purchase and consumption.

***Purchasers of Misbranded AvoDerm Natural products Have Been Injured***

78.    Plaintiffs read and reasonably relied on the labels as described herein when buying AvoDerm Natural products. The front label, alleging that AvoDerm Natural products are natural, appears as follows (for every single product alleged herein in the AvoDerm Natural Grain Free line):



Peas, Salmon Meal, Potatoes, Pea Flour, Canola Oil (Preserved with Mixed Tocopherols), Tomato Pomace (Source of Lycopene), Apple, Avocado, Flax Seed (Source of Omega-3 Fatty Acid), Alfalfa Meal, Natural Flavor, Salt, Potassium Chloride, Vitamins (Choline Chloride, a-Tocopherol Acetate (Source of Vitamin E), Niacin, Calcium Pantothenate, Vitamin A Supplement, Ascorbic Acid (Source of Vitamin C), Pyridoxine Hydrochloride (Source of Vitamin B6), Thiamine Mononitrate (Source of Vitamin B1), Riboflavin Supplement, Vitamin B12 Supplement, Vitamin D3 Supplement, Biotin, Folic Acid), Minerals (Zinc Sulfate, Zinc Amino Acid Chelate, Ferrous Sulfate, Manganese Sulfate, Manganese Amino Acid Chelate, Copper Sulfate, Copper Amino Acid Chelate, Sodium Selenite, Calcium Iodate), Kelp Meal, Avocado Oil, Lecithin, Rosemary

Extract, Sage Extract, Pineapple Stem (Source of Bromelain), Papain, Dried Bacillus Subtilis Fermentation Product, Dried Aspergillus Oryzae Fermentation Product.



Beef Meal, Peas, Potatoes, Chicken Fat (Preserved with Mixed Tocopherols), Tomato Pomace (Source of Lycopene), Pea Flour, Apple, Avocado, Flax Seed (Source of Omega-3 Fatty Acid), Alfalfa Meal, Natural Flavor, Salt, Potassium Chloride, Vitamins (Choline Chloride, a-Tocopherol Acetate (Source of Vitamin E), Niacin, Calcium Pantothenate, Vitamin A Supplement, Ascorbic Acid (Source of Vitamin C), Pyridoxine Hydrochloride (Source of Vitamin B6), Thiamine Mononitrate (Source of Vitamin B1), Riboflavin Supplement, Vitamin B12 Supplement, Vitamin D3 Supplement, Biotin, Folic Acid), Minerals (Zinc Sulfate, Zinc Amino Acid Chelate, Ferrous Sulfate, Manganese Sulfate, Manganese Amino Acid Chelate, Copper Sulfate, Copper Amino Acid Chelate, Sodium Selenite, Calcium Iodate), Kelp Meal, Avocado Oil, Lecithin, Rosemary Extract, Sage Extract, Pineapple Stem (Source of Bromelain), Papain, Dried Bacillus Subtilis Fermentation Product, Dried Aspergillus Oryzae Fermentation Product.



Ocean Fish Meal (Source of Omega 3), Peas, Tapioca Flour, Pea Flour, Chicken Meal, Chicken Fat (Preserved with Mixed Tocopherols), Dried Tomato Pomace, Avocado, Natural Flavor, Flax Seed, Dried Egg Product, Dried Chicory Root, Salt, Whey, Potassium Chloride, Vitamins (Choline Chloride, a-Tocopherol Acetate (Source of Vitamin E), Niacin, Vitamin A Acetate, Thiamine Mononitrate (Source of Vitamin B1), Calcium Pantothenate, Pyridoxine Hydrochloride (Source of Vitamin B6), Menadione Sodium Bisulfite Complex, Riboflavin Supplement, Ascorbic Acid (Source of Vitamin C), Vitamin D3 Supplement, Vitamin B12 Supplement, Folic Acid, Biotin), Minerals (Zinc Sulfate, Zinc Amino Acid Chelate, Iron Amino Acid Chelate, Ferrous Sulfate, Copper Sulfate, Manganese Amino Acid Chelate, Copper Amino Acid Chelate, Manganous Oxide Sodium Selenite, Calcium Iodate), Avocado Oil, Lecithin, Taurine, Calcium Carbonate, Parsley Flakes, Kelp Meal, DL-Methionine, Yucca Schidigera Extract, Inositol.



Turkey Meal, Peas, Tapioca Flour, Pea Flour, Chicken Fat (Preserved with Mixed Tocopherols), Dried Tomato Pomace, Herring Meal (Source of Omega 3), Avocado, Natural Flavor, Flax Seed, Dried Egg Product, Dried Chicory Root, Salt, Whey, Potassium Chloride, Vitamins (Choline Chloride, a-Tocopherol Acetate (Source of Vitamin E), Niacin, Vitamin A Acetate, Thiamine Mononitrate (Source of Vitamin B1), Calcium Pantothenate, Pyridoxine Hydrochloride (Source of Vitamin B6), Menadione Sodium Bisulfite Complex, Riboflavin Supplement, Ascorbic Acid (Source of Vitamin C), Vitamin D3 Supplement, Vitamin B12 Supplement, Folic Acid, Biotin), Minerals (Zinc Sulfate, Zinc Amino Acid Chelate, Iron Amino Acid Chelate, Ferrous Sulfate, Copper Sulfate, Manganese Amino Acid Chelate, Copper Amino Acid Chelate, Manganous Oxide, Sodium Selenite, Calcium Iodate), Avocado Oil, Lecithin, Taurine, Calcium Carbonate, Parsley Flakes, Kelp Meal, DL-Methionine, Yucca Schidigera Extract, Inositol.

79.    Plaintiffs relied on Defendant's labeling, and based and justified the decision to purchase AvoDerm Natural products in substantial part, on these labels.

80.    At point of sale, Plaintiffs did not know, and had no reason to know, that AvoDerm Natural products contained synthetic and/or artificial chemical ingredients.

81.    At point of sale, Plaintiffs did not know, and had no reason to know, that AvoDerm Natural products were unlawful and misbranded.

82.    Had Plaintiffs been aware of these material facts, they would not have bought AvoDerm Natural products.

83.     As a result of Defendant's unlawful misrepresentations, Plaintiffs and millions of others in Florida and throughout the United States purchased AvoDerm Natural products.

84.     Defendant's labeling as alleged herein is false and misleading and was designed to increase sales of the AvoDerm Natural products.

85.     Defendant's misrepresentations are part of its systematic labeling practice.

86.     A reasonable person would attach importance to Defendant's misrepresentations in determining whether to purchase AvoDerm Natural products.

87.     Plaintiffs' purchase of AvoDerm Natural products damaged them.

88.     Such purchases damaged Plaintiffs because, *inter alia*, misbranded products are illegal and have no economic value.

89.     Such purchases damaged Plaintiffs because, *inter alia,* Plaintiffs had cheaper alternatives available and paid an unwarranted premium for AvoDerm Natural products.

90.     All purchasers of AvoDerm Natural products were injured.

## CLASS ACTION ALLEGATIONS

91.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following class:

> All persons in Florida who, within the Class Period, purchased, "AvoDerm Natural Grain Free Salmon Meal & Potato Formula for Dogs," "AvoDerm Natural Grain Free Red Meat Meal & Potato Formula for Dogs," "AvoDerm Natural Grain Free Ocean Fish & Chicken Meal Formula for Cats," and "AvoDerm Natural Grain Free Turkey Meal Formula for Cats."

92.     The following persons are expressly excluded from the Class: (1) Defendant and its subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the Court to which this case is assigned and its staff.

93.     This action can be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

94.     **Numerosity:** Based upon Defendant's publicly available sales data with respect to AvoDerm Natural products, it is estimated that the Class numbers are potentially in the millions, and the joinder of all Class members is impracticable.

95.     **Common Questions Predominate:** This action involves common questions of law and fact applicable to each Class member that predominate over questions that affect only individual Class members. Thus, proof of a common set of facts will establish the right of each Class member to recover. Questions of law and fact common to each Class member include, for example:

a.     Whether Defendant engaged in unfair, unlawful or deceptive business practices by failing to properly package and label AvoDerm Natural products sold to consumers;

b.     Whether the food products at issue were misbranded or unlawfully packaged and labeled as a matter of law;

c.     Whether Defendant made unlawful and misleading claims regarding the "Natural" characteristic of the AvoDerm Natural products;

d.     Whether Defendant violated Florida's Consumer Protection Statues §§501.201-501.213 (2014), Florida Deceptive and Unfair Trade Practice Act, False Advertising pursuant to Fla. Stat. § 817.44 (2014), Breach of Express Warranty Pursuant to Fla. Stat. §672.313 (2014); Breach of Implied Warranties for Merchantability and Usage of Trade Pursuant to Fla. Stat. §672.314 (2014), was Negligent, or was Unjustly Enriched.

e.      Whether Plaintiffs and the Class are entitled to equitable and/or injunctive relief;

f.      Whether Defendant's unlawful, unfair and/or deceptive practices harmed

Plaintiffs and the Class;

g.      Whether Defendant acted negligently by its deceptive practices;

h.      Whether Defendant was unjustly enriched by its deceptive practices.

96.      **Typicality:** Plaintiffs' claims are typical of the claims of the Class because

Plaintiffs purchased Defendant's products during the Class Period. Defendant's unlawful, unfair,

and fraudulent actions concern the same business practices described herein, irrespective of

where they occurred or were experienced. The injuries of each member of the Class were caused

directly by Defendant's wrongful conduct. In addition, the factual underpinning of Defendant's

misconduct is common to all Class members and represents a common thread of misconduct

resulting in injury to all members of the Class. Plaintiffs' claims arise from the same practices

and course of conduct that give rise to the claims of the Class members and are based on the

same legal theories.

97.      **Adequacy:** Plaintiffs will fairly and adequately protect the interests of the Class.

Neither Plaintiffs nor their counsel have any interests that conflict with or are antagonistic to the

interests of the Class members. Plaintiffs have retained highly competent and experienced class

action attorneys to represent their interests and those of the members of the Class. Plaintiffs and

their counsel have the necessary resources to adequately and vigorously litigate this class action,

and Plaintiffs and their counsel are aware of their fiduciary responsibilities to the Class members

and will diligently discharged those duties by vigorously seeking the maximum possible

recovery for the Class.

98.    **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they are not parties. Class Action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would create. Further, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Class treatment of common questions of law and fact would also be superior to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the Court and the litigants, and will promote consistency and efficiency of adjudication.

99.    The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate injunctive or equitable relief with respect to the Class as a whole.

100.    The prerequisites to maintaining a class action pursuant to Fed R. Civ. P. 23(b)(3) are met as questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

101.    Plaintiffs and their counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

102.    Plaintiffs are members of the Class they seek to represent.  Plaintiffs' claims are typical of the Class members' claims. Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiff's claims are typical and representative of the Class.

103.    There are no unique defenses that may be asserted against Plaintiffs individually, as distinguished from the Class. The claims of Plaintiffs are the same as those of the Class.

104.    This class action is superior to any other method for the fair and efficient adjudication of this dispute.

## CAUSES OF ACTION
### COUNT I

**VIOLATION OF FLORIDA CONSUMER PROTECTION STATUTES §501.201- §501.213, FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**

105.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 104 above as if fully set forth herein.

106.    Defendant's conduct constitutes unlawful, unfair and deceptive business acts and trade practices.

107.    Defendant sold the AvoDerm Natural products in Florida during the Class Period.

108.    Florida Consumer Protection Statue §501.204 (2012) prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising. For the reasons discussed above, Defendant has engaged in unfair, false, deceptive, untrue and misleading advertising in violation of Fla. Stat. §§501.201-501.213 (2014).

109.    The Florida Deceptive and Unfair Trade Practices Act also prohibits any, "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in conduct of any trade or commerce." Defendant has violated Fla. Sat. §501.204's prohibition against engaging in unlawful acts and practices by, *inter alia,* making the false and deceptive representations, and also through its omissions of material facts, as set forth more fully herein, and violating 21 U.S.C. §342, 21 U.S.C. §343, 21 U.S.C. §379aa-1, 15 U.S.C. §45 (a)(I), 49 Fed. Reg. 30999 (Aug. 2, 1984), Federal Food, Drug and Cosmetic Act §402(f)(1)(A), and the common law.

110.    Plaintiffs and the Class reserve the right to allege other violations of law which constitute other unlawful business acts or practices. Such conduct is ongoing to this date.

111.    Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§501.201-501.213 (2014), in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributed to such conduct.

112.    As stated in this Complaint, Plaintiffs allege violations of consumer protection, unfair competition, and truth-in-advertising laws in Florida resulting in harm to consumers. Defendant's conduct constitutes violations of the public policies against engaging in false and misleading advertising, unfair competition and deceptive conduct towards consumers as proscribed by Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§501.201-501.213 (2014).

113.    There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

114.    Defendant's claims, nondisclosures and misleading statements, as more fully set forth above and collectively as a scheme, were false, misleading and likely to deceive the consuming public within the meaning of Florida Deceptive and Unfair Trade Practices Act.

115.    Defendant's deceptive conduct constitutes a prohibited practice, which directly and proximately caused and continues to cause substantial injury to Plaintiffs and the other Class members. Plaintiffs and Class members have suffered injury in fact, actual damages, and have lost money as a result of Defendant's unlawful, unfair and fraudulent conduct.  Plaintiffs' damages are the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties.  Defendant's deceptively labeled, and falsely advertised, and misbranded products have little to no market value.

116.    Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate.

117.    Plaintiffs, on behalf of themselves, and all others similarly situated, seek restitution and disgorgement of all money obtained from Plaintiffs and the members of the Class collected as a result of unfair competitions, an injunction prohibiting Defendant from containing such practices, corrective advertising, including providing notification of the product's health risks, and all other relief this Court deems appropriate, consistent with Florida Deceptive and Unfair Trade Practices Act.

## COUNT II

### VIOLATION OF FLORIDA INTENTIONAL
### FALSE ADVERTISING STATUTE §817.44

118.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 104 above as if fully set forth herein.

119.    Defendant knowingly and intentionally engaged in false advertising concerning the true characteristics of the ingredient contents of the AvoDerm Natural products. Defendant's conduct was consumer-oriented and this conduct had a broad impact on consumers at large.

120.    Defendant's actions were unlawful and under the circumstances, Defendant had actual knowledge of the falsity, or at the very least ought to have known of the falsity thereof.

121.    Fla. Stat. § 817.44 (2014) defines "false advertising," as, "invitations for offers for the sale of any property, real or personal, tangible or intangible, or any services, professional or otherwise, by placing or causing to be placed before the general public, by any means whatever, an advertisement describing such property or services as part of a plan or scheme with the intent not to sell such property or services so advertised."

122.    Defendant intentionally, and falsely advertised the AvoDerm Natural products in Florida and throughout the United States.

123.    As fully alleged above, by intentionally and knowingly advertising, marketing, distributing and selling the mislabeled AvoDerm Natural products to Plaintiffs and other members of the Class who purchased the products in Florida, Defendant engaged in, and continues to engage in, false advertising in violation of Fla. Stat. § 817.44 (2014).

124.    Defendant's misleading marketing, advertising, packaging and labeling of the AvoDerm Natural products were likely to deceive reasonable consumers.

125.    Plaintiff and other members of the Class who purchased the AvoDerm Natural products in Florida were deceived.

126.    Absent such injunctive relief, Defendant will continue to falsely and illegally advertise the AvoDerm Natural products to the detriment of consumers in the state of Florida.

127.    As a direct and proximate cause of Defendant's violation of Fla. Stat. § 817.44 (2014), Plaintiffs and the members of the Class who purchased the AvoDerm Natural products in Florida were injured when they paid good money for these illegal and worthless products.

128.    As a result of Defendant's unlawful false advertising practices, Plaintiffs and the members of the Class who purchased the AvoDerm Natural products in Florida, are entitled to an order enjoining such future conduct and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and to restore to Plaintiffs and the members of the Class any money paid for the AvoDerm Natural products pursuant to Fla. Stat. § 817.44 (2014).

129.    Plaintiffs and the members of the Class are also entitled to attorneys' fees.

### COUNT III

### BREACH OF EXPRESS WARRANTY PURSUANT TO PRUSUANT TO § 672.313 FLORIDA STATUTES AND UNIFORM COMMERICAL CODE §2-313

130.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 104 above as if fully set forth herein.

131.    Plaintiffs, and each member of the Class, formed a contract with Defendant at the time Plaintiffs and the other members of the Class purchased the AvoDerm Natural products. The terms of that contract included express promises and affirmations of fact made by Defendant on the AvoDerm Natural products' packaging and through its marketing campaign, as described above. The AvoDerm Natural products' packaging and advertising constitute express warranties

34

and became part of the basis of the bargain, and is part of a standardized contract between Plaintiffs and the members of the Class on the one end, and Defendant on the other.

132. The Uniform Commercial Code §2-313 provides that express warranties by the seller are created when any affirmation of fact or promise is made by the seller to the buyer which relates to the goods, and thus becomes part of the basis of the bargain, creates an express warranty that the goods shall conform to the affirmation or promise. In addition, any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

133. Florida has codified and adopted the provisions the Uniform Commercial Code governing express warranties. *See* Fla. Stat. §672.313 (2014).

134. AvoDerm Natural products are "goods" as defined in the various states' commercial codes governing express warranties, including Florida. At all times, and as detailed above, Defendant expressly warranted that its products were "Natural."

135. At the time of making these and other warranties with respect to the characteristics of AvoDerm Natural products, Defendant knew or should have known that it had breached the terms of the contract, including the express warranties with Plaintiffs and the Class, by providing the AvoDerm Natural products named, "AvoDerm Natural Grain Free Salmon Meal & Potato Formula for Dogs," "AvoDerm Natural Grain Free Red Meat Meal & Potato Formula for Dogs," "AvoDerm Natural Grain Free Ocean Fish & Chicken Meal Formula for Cats," and "AvoDerm Natural Grain Free Turkey Meal Formula for Cats" that contained the synthetic and/or artificial chemical ingredients tocopherols, ascorbic acid, lecithin, ferrous sulfate, manganese sulfate, and copper sulfate.

136.    Members of the public, including Plaintiffs, reasonably relied upon the skill and judgment of Defendant, and upon said express warranties, when purchasing AvoDerm Natural products.

137.    Plaintiffs and the Class purchased AvoDerm Natural products without knowledge that these products contained synthetic and/or artificial chemical ingredients; tocopherols, ascorbic acid, lecithin, ferrous sulfate, manganese sulfate, and copper sulfate.

138.    Due to Defendant's wrongful conduct as alleged herein, Plaintiffs and the Class could not have known about the true content of the AvoDerm Natural products.

139.    As a direct and proximate result of Defendant's breach of its contract, including the breach of express warranties with respect to the AvoDerm Natural products, Plaintiffs suffered injuries as set forth above, entitling Plaintiffs to judgment and equitable relief against Defendant, as well as restitution, including all monies paid for the AvoDerm Natural products and disgorgement of profits from Defendant received from sales of the AvoDerem Natural products, attorneys' fees, punitive damages, and costs, as set forth in the Prayer for Relief.

140.    All conditions precedent to Defendant's liability under this contract, including notice, have been performed by Plaintiffs and the Class.

### COUNT IV

### BREACH OF IMPLIED WARRANTY: MERCHANTABILITY; USAGE OF TRADE PRUSUANT TO § 672.314 FLORIDA STATUTES AND UNIFORM COMMERICAL CODE §2-314

141.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 104 above as if fully set forth herein.

142.    The Uniform Commercial Code §2-314 provides that, unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of the kind.

143.    Florida has codified and adopted the provisions the Uniform Commercial Code governing the implied warranty of merchantability. Fla. Stat. §672.314 (2014).

144.    AvoDerm Natural products are "goods" as defined in the various states' commercial codes governing the implied warranty of merchantability, including Florida.

145.    As designers, manufacturers, licensors, producers, marketers, and sellers of AvoDerm Natural products, Defendant is a "merchant" within the meaning of the various states' commercial codes governing the implied warranty of merchantability, including Florida.

146.    By placing the AvoDerm Natural products in the stream of commerce, Defendant impliedly warranted that the products are reasonably safe and that all claims on their packaging were true, i.e. "Natural."

147.    As merchants of the AvoDerm Natural products, Defendant knew that purchasers relied upon them to design, manufacture, license and sell products that were reasonably safe and not deceptively marketed, and in fact members of the public, including Plaintiffs, reasonably relied upon the skill and judgment of Defendant and upon said implied warranties in purchasing and consuming the AvoDerm Natural products.

148.    Plaintiffs and the Class members purchased the AvoDerm Natural products for their intended purpose.

149.    AvoDerm Natural products' defects were not open or obvious to consumers, including Plaintiffs and the Class, who could not have known about the true nature and contents of the AvoDerm Natural products.

150.    Plaintiffs, and each member of the Class, formed a contract with Defendant at the time Plaintiffs and the other members of the Class purchased the AvoDerm Natural products. The terms of that contract included implied promises and affirmations of fact made by Defendant on the AvoDerm Natural products' packaging and through its marketing campaign, as described above. The AvoDerm Natural products' packaging and advertising constitute implied warranties, became parts of the basis of the bargain, and are parts of a standardized contract between Plaintiffs and the members of the Class on the one end, and Defendant on the other.

151.    At all times, and as detailed above, Defendant impliedly warranted that its products were safe, effective and fit for use by consumers, including Plaintiffs and the Class, for their intended use, that they were of merchantable quality, and that they did not produce dangerous side effects.

152.    At the time of making these and other warranties with respect to the safety, efficacy, testing and characteristics of AvoDerm Natural products, Defendant knew or should have known that it had breached the terms of the contract, including the implied warranties with Plaintiffs and the Class, by providing the AvoDerm Natural products named, "AvoDerm Natural Grain Free Salmon Meal & Potato Formula for Dogs," "AvoDerm Natural Grain Free Red Meat Meal & Potato Formula for Dogs," "AvoDerm Natural Grain Free Ocean Fish & Chicken Meal Formula for Cats," and "AvoDerm Natural Grain Free Turkey Meal Formula for Cats" that contained the synthetic and/or artificial chemical ingredients tocopherols, ascorbic acid, lecithin, ferrous sulfate, manganese sulfate, and copper sulfate.

153.    Members of the public, including Plaintiffs, reasonably relied upon the skill and judgment of Defendant, and upon said implied warranties, when purchasing AvoDerm Natural products.

154.    Plaintiffs and the Class purchased AvoDerm Natural products without knowledge that these products contained synthetic and/or artificial chemical ingredients; tocopherols, ascorbic acid, lecithin, ferrous sulfate, manganese sulfate, and copper sulfate.

155.    Due to Defendant's wrongful conduct as alleged herein, Plaintiffs and the Class could not have known about the true content of the AvoDerm Natural products.

156.    As a direct and proximate result of Defendant's breach of implied warranties and breach of merchantability, Plaintiffs and Class members have sustained injuries by purchasing the AvoDerm Natural products, which were not as represented, thus entitling Plaintiffs to judgment and equitable relief against Defendant, as well as restitution, including all monies paid for the AvoDerm Natural products and disgorgement of profits from Defendant received from sales of the products, attorneys' fees, punitive damages, and costs, as set forth in the Prayer for Relief.

157.    All conditions precedent to Defendant's liability under this contract, including notice, has been performed by Plaintiffs and the Class.

## COUNT V

## NEGLIGENCE

158.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 104 above as if fully set forth herein.

159.    Defendant had a duty to represent its products accurately.  Defendant breached that duty by purposefully or negligently making misrepresentations of fact and omissions of material fact to Plaintiffs and the other Class members about the AvoDerm Natural products.

160.    Defendant failed to label or advertise the AvoDerm Natural products in a lawful manner and violated duties owed to consumers by purposefully or negligently engaging in the conduct described herein.

161.    Plaintiffs and the other Class members, as a direct and proximate cause of Defendant's breach of its duties, were damaged by receiving worthless products, or at the very least, misbranded deceptively labeled products.

162.    As described above, Defendant's actions violated a number of express statutory provisions designed to protect Plaintiffs and the Class.

163.    Defendant's illegal actions constitute negligence *per se*.

Moreover, the statutory food labeling and misbranding provisions violated by Defendant are strict liability provisions.

164.    By reason of the foregoing, Plaintiffs and the other Class members have suffered damages in an amount to be determined at trial, together with punitive damages.

## COUNT VI

## UNJUST ENRICHMENT

165.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 104 above as if fully set forth herein.

166.    As a result of Defendant's fraudulent and misleading labeling, advertising, marketing, and sales of the AvoDerm Natural products, Defendant was enriched at the expense of Plaintiffs and the Class.

167.    Defendant sold the AvoDerm Natural products, which was a product that was illegally sold, illegally branded and had no economic value, to Plaintiffs and the Class.

168.    It would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits it received from Plaintiffs and the Class in light of the fact that the products were not what Defendant purported them to be.

169.    Thus, it would be unjust and inequitable for Defendant to retain the benefit without restitution to Plaintiffs and the Class of all monies paid to Defendant for the AvoDerm Natural products at issue.

170.    As a direct and proximate result of Defendant's actions, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of their claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of all other similarly situated persons, pray for judgment against Defendant as follows:

A.    For an order certifying this case as a Class Action and appointing Plaintiffs and their counsel to represent the Class;

B.    That the Court adjudges and decrees that Defendant has engaged in the conduct alleged herein;

C.    Awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendant from continuing the unlawful practices as set forth herein, and directing Defendant to identify, with Court supervision, victims of its conduct and pay them restitution and disgorgement of all monies acquired by Defendant by means of any act or practice declared by this Court to be wrongful;

D.    Ordering Defendant to engage in a corrective advertising campaign;

E.    Awarding Plaintiffs and the proposed Class members damages;

F.    Awarding restitution and disgorgement to Plaintiffs and the other Class members;

G.    Awarding Plaintiffs and the Classes punitive damages;

H.    Awarding Plaintiffs treble damages;

I.    Awarding attorneys' fees and costs; and

J.    Providing such further relief as may be just and proper.

Dated: January 29, 2015

Respectfully submitted,

By: */s/ Tim Howard*
Tim Howard, J.D., Ph.D.
Florida Bar No.: 655325
**HOWARD & ASSOCIATES, P.A.**
2120 Killarney Way, Suite 125
Tallahassee, FL 32309
Telephone: (850) 298-4455
Fax: (850) 216-2537
tim@howardjustice.com